(Del. Rev. 5/2014) Pro Se Employment Discrimination Complaint

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

Robert E. Walker, Jr.

_____

(Name of Plaintiff or Plaintiffs)

v.

**14 - 1 5 0 0**

**Civ. Action No._____**
(To be assigned by Clerk's Office)

E.I. du Pont de Nemours &Co.

_____

(Name of Defendant or Defendants)

**COMPLAINT FOR
EMPLOYMENT DISCRIMINATION**
(Pro se)

Jury Demand?
☐ Yes
☒ No

1.  This action is brought pursuant to (check all spaces that apply):

    ☐   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, for employment discrimination on the basis of race, color, religion, sex, or national origin.

    ☑   Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621, *et seq.*, for employment discrimination on the basis of age. My year of birth is: 9 23 53 .

    ☐   Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701, *et seq.*, for employment discrimination on the basis of a disability by an employer which constitutes a program or activity receiving federal financial assistance.

    ☑   Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.*, for employment discrimination on the basis of disability.

2.  Plaintiff resides at  116 Torington Way
    Newark    New Castle  (Street Address)  19702
    (City)    (County)    (State)    (Zip Code)
    302. 373.2744 . **Attach additional sheets if more than one Plaintiff.**
    (Area Code) (Phone Number)

3.  Defendant resides at, or its business is located at  1007 N. Market Street
    Wilmington    New Castle    DE (Street Address) 19898    .(
    (City)    (County)    (State)    (Zip Code)

**Attach additional sheets if more than one Defendant.**

1

4.  The discriminatory conduct occurred in connection with plaintiff's employment at, or application

to be employed at, defendant's _DuPont Chestnut Run_ place of business
(Defendant's Name)

located at _974 Centre Rd_
(Street Address)

_Wilmington_ _New Castle_ _DE_ _19805_ .(
(City)  (County)  (State)  (Zip Code)

5.  The alleged discriminatory acts occurred on _14_ , _March_ , _2012_ .
(Day)  (Month)  (Year)

6.  The alleged discriminatory practice ☐ is ☑ is not continuing.

7.  On _____ , _____ , _____ , Plaintiff filed charges
(Day)  ( Month)  (Year)

with the Department of Labor of the State of Delaware: _____ ,
(Agency)

_____ _____ _____
(Street Address)  (City)  (County)
_____ , regarding defendant's alleged discriminatory conduct.
(State)  (Zip Code)

8.  On _11_ , _November_ , _2012_ , Plaintiff filed charges
(Day)  ( Month)  (Year)

with the Equal Employment Opportunity Commission of the United States regarding defendant's alleged

discriminatory conduct.

9.  The Equal Employment Opportunity Commission issued the attached Notice-of-Right-to-Sue

letter which was received by plaintiff on: _22_ , _September_ , _2014_ .
(Day)  (Month)  (Year)

**(NOTE:   ATTACH NOTICE-OF-RIGHT-TO-SUE LETTER TO THIS COMPLAINT.)**

10.  The alleged discriminatory acts, in this suit, concern:

A.  ☐ Failure to employ plaintiff.
B.  ☑ Termination of plaintiff's employment.  Plaintiff was terminated from employment on
the following date: _March 29, 2012_
C.  ☐ Failure to promote plaintiff.  Plaintiff was refused a promotion on the following date:
_____ .

D.  ☑ Other acts (please specify): _____

_Sexual harrassment (d have photos on my cell_

_phone)_ _____

_____

11.  The conduct of Defendant(s) was discriminatory because it was based on (check all that apply):

2

A. ☐ Plaintiff's race
B. ☐ Plaintiff's color
C. ☐ Plaintiff's sex
D. ☐ Plaintiff's religion
E. ☐ Plaintiff's national origin
F. ☑ Plaintiff's age
G. ☑ Plaintiff's disability

12. A copy of the charges filed with the Department of Labor of the State of Delaware and/or the Equal Employment Opportunity Commission is attached to this complaint and is submitted as a brief statement of the facts of plaintiff's claim.

**(NOTE: ATTACH A COPY OF THE CHARGES FILED WITH THE DEPARTMENT OF LABOR OF THE STATE OF DELAWARE AND/OR THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION OF THE UNITED STATES TO THIS COMPLAINT.)**

**THEREFORE,** Plaintiff asks the Court to grant such relief as may be appropriate, including but not

limited to (check all that apply):

A. ☐ Injunctive relief (specify what you want the Court to order): _____

B. ☑ Back pay.
C. ☑ Reinstatement to former position.
D. ☐ Monetary damages in the amount of _____.
E. ☐ That the Court appoint legal counsel.
F. ☐ Such relief as may be appropriate, including costs and attorney's fees.
G. ☑ Other (specify): Money lost in 401K contributions /add'l retirement pay

**I/We declare under penalty of perjury that the foregoing is true and correct.**

Dated: _12-21-2014_

(Signature of Plaintiff)

_____
(Signature of additional Plaintiff)

**NOTICE**

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

3

EEOC Form 161 (11/09)                    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | **Robert Walker**<br>**116 Torrington Way**<br>**Newark, DE 19702** | From: | **Philadelphia District Office**<br>**801 Market Street**<br>**Suite 1300**<br>**Philadelphia, PA 19107** |
| --- | --- | --- | --- |

|  | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |  |
| --- | --- | --- |

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| | **Legal Unit,** | |
| **530-2013-00699** | **Legal Technician** | **(215) 440-2828** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Enclosures(s)

**Spencer H. Lewis, Jr.,**
**District Director**

*(Date Mailed)*

9/22/14

cc:    E. I. DUPONT DE NEMOURS & COMPANY, INC.
       Martin D. Haverly, Esq. (for Charging Party)
       Michael B. Rush, Esq. (for Respondent)

Case 1:14-cv-01500-SLR Document 1 Filed 12/22/14 Page 5 of 19 PageID #: 5



**U.S. Equal Employment Opportunity Commission**
**Philadelphia District Office**

801 Market Street
Suite 1300
Philadelphia, PA 19107
(215) 440-2602
TDD: 1-800-669-6820
Fax: (215) 440-2604
1-800-669-4000

Respondent: E. I. DUPONT DE NEMOURS & COMPANY, INC.
EEOC Charge No.: 530-2013-00699
FEPA Charge No.:

June 18, 2013

Robert Walker
116 Torrington Way
Newark, DE 19702

Dear Mr. Walker:

This is to acknowledge receipt of the above-numbered charge of employment discrimination against the above-named respondent. Please use the "EEOC Charge No." listed above whenever you call us about this charge. The information provided indicates that the charge is subject to:

[ ]     Title VII of the Civil Rights Act of 1964 (Title VII)
[ X ]   The Age Discrimination in Employment Act (ADEA)
[ X ]   The Americans with Disabilities Act (ADA)
[ ]     The Equal Pay Act (EPA)
[ ]     The Genetic Information Nondiscrimination Act (GINA)

You need do nothing further at this time. We will contact you when we need more information or assistance. A copy of the charge or notice of the charge will be sent to the respondent within 10 days of our receipt of the charge as required by our procedures.

Please be aware that we will send a copy of the charge to Delaware Department of Labor DDOL Anti-Discrimination 4425 North Market Street, 3rd Floor Wilmington, DE 19802 as required by our procedures. If the charge is processed by that agency, it may require the charge to be signed before a notary public or an agency official. Then the agency will investigate and resolve the charge under their statute. If this occurs, section 1601.76 of EEOC's regulations entitles you to ask us to perform a Substantial Weight Review of the agency's final finding. To obtain this review, a written request must be made to this office within 15 days of receipt of the agency's final finding in the case. Otherwise, we will generally adopt the agency's finding as EEOC's.

While your charge is pending, please notify us of any change in your address, or where you can be reached if you have any prolonged absence from home. Your cooperation in this matter is essential.

Sincerely,

Frances Watson
Enforcement Supervisor
(215) 440-2649

Enclosure(s)

cc:  Martin D. Haverly
     DELLE DONNE CORPORATE CENTER
     1011 Centre Road, Suite 117
     Wilmington, DE 19805

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

☐ FEPA
☐ EEOC   530-2013-00699

and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* Mr. Robert Walker, Jr. | HOME TELEPHONE *(Include Area Code.)* (302) 368-3675 |
|---|---|

| STREET ADDRESS    CITY, STATE AND ZIP CODE 116 Torrington Way    Newark, DE 19702 | DATE OF BIRTH ▇▇953 |
|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME E.I. du Pont de Nemours and Co. | NUMBER OF EMPLOYEES, MEMBERS Greater than 70,000 worldwide | TELEPHONE *(Include Area Code.)* (302) 774-1000 |
|---|---|---|

| STREET ADDRESS    CITY, STATE AND ZIP CODE 1007 Market Street    Wilmington, DE 19898 | COUNTY New Castle |
|---|---|

| NAME | TELEPHONE NUMBER *(Include Area Code.)* |
|---|---|

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR ☐ SEX ☐ RELIGION  ☒ AGE
☒ RETALIATION ☐ NATIONAL  ☒ DISABILITY  ☒ OTHER
ORIGIN    Harassment

DATE DISCRIMINATION TOOK PLACE *(ADEA/EPA)*
EARLIEST 2007
LATEST (ALL) 3/29/2012
☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

See Bill of Particulars attached

MARTIN D. HAVERLY
ATTORNEY AT LAW
NOTARIAL OFFICER
STATE OF DELAWARE
29 DEL. C. SEC 4323(a)(3)

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date 10-14-2012    Charging Party (Signature)

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)  11/14/12

## **BILL OF PARTICULARS - EEOC CHARGE OF ROBERT WALKER, JR.**

### **Introduction**

1. This is a claim of disability discrimination under Americans with Disabilities Act

("ADA"), age discrimination under Age Discrimination in Employment Act ("ADEA"), and

retaliation for Robert Walker, Jr. ("Walker" or "Claimant") resulting in various undeserved

disciplinary actions against him, wrongful termination and severe mental and emotional distress.

Respondent, E.I. du Pont de Nemours and Company ("DuPont" or "Respondent") is a science

and technology based company, specializing in research, development, and sales of their

products. Walker was hired by DuPont on or about December 29, 1989, as a Repographic

Specialist. In 2005, he took a position as a Records Management Specialist in Respondent's

Vital Records and Storage/Records and Information Management Department. Walker

continued to work in that position until he was terminated in March 2012, after more than twenty

years with Respondent.

2. E.I. du Pont de Nemours and Company is headquartered in Wilmington, Delaware.

DuPont employs more than 70,000 employees worldwide.

3. All of the discriminatory actions against Walker took place in the State of Delaware.

### **Background**

4. On or about December 29, 1989, Walker was hired by DuPont as a Repographic

Specialist.

5. Walker continued to work for Respondent in various positions for records preservation

and management, printing, and as a technical assistant for research and development.

6. On or about the year 2004, Walker was diagnosed with Post-Traumatic Stress

Disorder ("PTSD") resulting from his combat service with the United States Army and

aggravated by the death of his son in 2004.

7. On or about the year 2005, Walker was promoted to the position of Records Management Specialist in the Vital Records and Storage/Records and Information Management Department.

8. On or about late October 2009, Rebecca Brown ("Brown")(c.50 years old) , Walker's supervisor, asked Walker for documentation that he did in fact have PTSD.

9. On or about October 29, 2009, Brown emailed Walker a release for him to sign authorizing the release of his psychological evaluation to show that he was complying with the Employee Assistance Program (EAP) requirements. Walker never received a copy of the documentation released to Brown.

10. As part of the terms of the authorization, Brown would receive information about Walker's compliance and completion of therapy sessions that Respondent required Walker to attend.

11. Walker's co-workers were also aware of his PTSD. They were aware of his sensitive areas, such as military service and the stigma attached to suicide. Walker's co-workers would target these areas when taunting and harassing Walker, which they did on a daily basis.

12. His co-workers would call Walker names like "Unibomber," "Timothy McVey," and "Dietrick." They would joke that Walker had a miserable face and that they needed to worry about him "going postal."

13. Walker's co-workers would also frequently make negative and harassing comments to him about the tone of his voice, his facial expressions, his military service, the bag he carried to work, and suicide victims.

2

14. One of Walker's co-workers, Bill Salerno ("Salerno"), would even send pornographic images to his cell phone during work hours. Walker repeatedly asked Salerno to stop sending him the pictures but Salerno continued to do so.

15. Beginning in approximately 2007, when Walker reported his coworkers' behavior and harassment during his regularly scheduled performance reviews (approximately twice a year), Brown would tell him that he needed to learn to deal with the co-workers' comments and their treatment of him. Walker eventually stopped complaining about his co-workers' discriminatory attitudes and actions to Brown because of her indifference and unwillingness to correct behavior or provide Walker with a reasonable accommodation.

16. For example, Salerno and/or Rich Jordan ("Jordan") would complain to Brown about Walker's tone of voice or body language and Brown would speak to Walker about Jordan or Salerno's complaints. Unlike when Walker complained to her about other coworkers' harassment, when Brown would take Jordan or Salerno's side for each complaint. Walker had to provided her with documentation or a record supporting his side before she would back off.

17. Also when Walker would report his coworkers' behavior and harassment, Brown would tell him to seek therapy to learn how to deal with their treatment or give him books on how to deal with difficult people. Brown did not recommend that the coworkers' who Walker complained about attend therapy, read books about dealing with difficult people, or discipline them for their treatment of Walker.

18. Each time after Walker would complain to Brown about how he was being harassed and bullied by his coworkers, they would intensify and increase their harassment of Walker.

19. Walker asked Brown for reasonable accommodation on numerous occasions starting

3

on or about the year 2009. He asked to be transferred to another group of cubicles in the department, to move to another desk across the room, and to be able to walk away from situations. Brown told Walker that she would not be able to move him to another open desk in the department because it would be too expensive, even though the costs would have been only to transfer the computer and phone extension to the new desk. If Walker would go into an available office with a door to work on a project, she would tell him that he needed to socialize more with others in the group.

20. Despite his coworkers' treatment and harassment, Walker continued to perform well at his job. He even became the first person in his work group to earn a Six Sigma Green Belt certification on or about April 2010.

21. On or about the year 2009, Walker's position changed. His former responsibility of filming various lab sites across the country was discontinued, but he was not provided with exempt level work with the position change. Instead Brown gave projects classified as exempt to others including non-exempt employees.

22. On or about September 2011, Walker began meeting with a counselor at the Veterans' Center who specialized in treatment of PTSD to help cope with how he was being treated by his coworkers and to help him manage his stress and create strategies to handle the harassment.

23. On or about late November 2011, Walker met with Brown for his individual personal performance review. Brown told Walker that he was doing a good job and that he should "stay on the path of doing what you've been doing."

24. On or about January 2012, Walker's team members' mocking became worse. They

4

frequently called him names and referred to him as miserable. Their harassment of Walker became worse and more frequent. They would focus on something they knew would bother him and keep at it until they finally got a reaction from Walker. They would focus their negative comments and harassment on areas and topics involving the military, suicide, or PTSD. For example, any time a newspaper article involved a criminal who was alleged to have PTSD, they would make comments about how the people involved were crazy or criticize the individuals in the story. It became so unbearable for Walker that he told his team members that he was going to have to go to H/R and complain about it if they did not stop.

25. On or about late January 2012, Donna Dvorak ("Dvorak"), one of Walker's team members, told Walker that he needed to watch out. She warned him to be careful what he said or did because he was being "watched."

26. On or about late January 2012, Walker learned from Dvorak that Jordan was going in every day to Brown and reporting everything that Walker had done for the day.

27. On or about February 2012, Brown met with Walker and informed him that he was being placed on a Performance Improvement Plan and that he would receive a copy of the plan. Despite her positive statements in November of 2011, Brown told him that he was working below expectations because he needed to improve his interpersonal skills and that she was lowering Walker's performance evaluation rating.

28. During the meeting, Brown inexplicably told Walker that H/R had reviewed his last three performance evaluations and determined that based on Walker's behavior, he was working below expectations. None of this was mentioned in his annual review which had been conducted only a few months before on or about November 2011.

5

29. Brown told Walker not to worry about the change in his performance review because she would help him bring his rating back up to the level where it needed to be.

30. On or about February 9, 2012, Walker spoke with Mary Ann Bradley ("Bradley"), Human Resources Analyst, about how he was being treated by three coworkers in his group and his performance rating change. Walker told Bradley about the change his rating and the reasons why it did not make sense to him, including the fact that Brown had told him in approximately November 2011 that he was doing a great job. He also expressed his concern that Brown was not providing him with exempt level work for his position.

31. Bradley told Walker not to worry about the rating change. She also informed him that Brown had a month to let him know what exempt job duties she had for him to do.

32. During the meeting with Bradley, Walker also told her about how his coworkers were treating him and their harassment, including their name calling, mocking, and Salerno sending him homosexual pornography.

33. On or about February 2012, after Walker spoke with Bradley, his coworkers' harassment, taunting, and bullying intensified and became even worse.

34. On or about March 1, 2012, Kenneth Hunter ("Hunter"), who worked in Respondent's legal department, approached Walker and asked if he had done or said something that offended Walker because he kept to himself and did not talk to Hunter when he was helping the work group with their contract project on Thursdays. Walker noticed Salerno watching their conversation and grinning. Later Salerno told Walker that he enjoyed listening to the conversation between Walker and Hunter.

35. On or about March 8, 2012, the following Thursday when Hunter returned to the

6

work group's area. Walker approached Hunter when he was alone at the table to talk with him. Walker explained to Hunter why he was so quiet. He told him that since his son's death, he had good days and bad days. Walker said that he did not always feel like talking and sometimes just kept to himself. Walker and Hunter chatted for a bit and shook hands at the end. Walker noticed a few of his coworkers watching his conversation with Hunter.

36. Later in the afternoon, Walker shared his conversation with Hunter with a couple of his coworkers. Dunn responded to Walker "well you do have a miserable face." Walker feigned laughter at the comment because he knew based on past experience that if he showed that something bothered him, that his coworkers would continue to badger him about it.

37. After Dunn's comment, Dunn, Salerno, and Jordan would frequently use the word "miserable" when referring to Walker. For example, one time when the work group was discussing a $20.00 gift card incentive for coworkers to nominate each other for helping each other or suggesting an improvement, Dunn announced that Walker would never receive one because he was miserable.

38. On or about March 9, 2012, Lori Bryant ("Bryant") arrived to work wearing a Philadelphia Eagles' shirt. Walker, known to be a non-Eagles fan, jokingly said to Bryant "oh you had to wear that shirt." Bryant did not turn around but responded to Walker with a negative comment, mumbled under her breath. Walker expressed to Bryant how he felt about being called miserable and got up to go into the hallway to call his wife. After the phone call, Walker returned to the cube, put his tennis shoes on and went for a walk. When Walker returned from his walk, he went back to his desk and continued to work on his project.

39. Walker had been instructed by his counselor to leave when he was feeling

7

uncomfortable, bullied, or harassed. As a strategy for handling and defusing uncomfortable and stressful situations such as his coworkers' harassment and bullying, Walker and his counselor came up with several ways he could respond to the situation, including going for a walk or calling his wife.

40. On or about March 12, 2012, Walker was working on a project at his desk in the morning. The rest of his work group were sitting at the table working on the contracts project. Walker noticed Dunn and Jordan whispering to each other. Shortly afterwards, Dunn walked by Walker's desk red faced and looking angry.

41. After that morning, Walker noticed Dunn and Salerno's demeanor became even worse towards him. The work group would frequently gossip about their coworkers, including gossiping about Walker. Walker assumed that the change in their demeanor was caused by Jordan gossiping about what had happened between Walker and Bryant the week before and Walker being upset by being called "miserable." For the next several days, Dunn, Jordan, and Salerno ignored Walker completely. When Walker tried to greet them in the mornings, only Salerno would respond with "good morning."

42. On or about March 14, 2012, in an attempt to clear the air with his coworkers, Walker decided to approach Dunn, Jordan, and Salerno individually to share a short cut he had discovered while working on the COT form. Each coworker thanked him for the tip and Walker believed that everything was okay between them.

43. After lunch, Jordan and Dvorak were talking about her home internet connection. Walker asked Jordan a couple of questions in an attempt to help. Jordan never responded or acknowledged Walker, so he went back to work on his project.

8

44. On or about March 14, 2012, Dunn and Jordan left work out the back office exit so Walker left work through the regular office exit to avoid any remarks or confrontation. Almost every day Dunn went out the regular office exit when he left work, but on March 14th, he went out the backdoor apparently in an attempt to cause a confrontation. Walker ran into them at the exit door to the parking lot. When Dunn saw Walker, he spun around and started back into the office. Walker continued to his truck and started to leave the parking lot. Dunn came back out of the building with an angry look on his face. Dunn was within approximately 25 feet of Walker's truck when Dunn angrily approached Walker's truck and asked him what his problem was. Surprised, Walker responded with "you." Dunn replied, "f–k you and the confrontation escalated from there before Dunn abruptly stopped and walked away. Walker continued to leave the parking lot but saw Dunn heading back into the building. Walker then turned around and headed back to the building as well. Walker asked Dunn if he wanted to make this an H/R issue because he was tired of all of the behavior that went on in the group and it always being directed at Walker. Jordan was holding the door to the building open and watching Walker and Dunn so Walker asked Jordan if he wanted to come join the conversation. Then all three men went back into the building to go to Brown's office.

45. Walker, Dunn, and Jordan went to Brown's office to discuss the incident in the parking lot that had just occurred. Brown called Dale McCashew ("McCashew"), her supervisor, and asked him to participate in the discussion.

46. After McCashew arrived, he came into the office, closed the door, and sat down to discuss things with Walker, Jordan, Dunn, and Brown. Walker explained to McCashew how his coworkers had been treating him. As Walker was discussing how he had been treated, his eyes

9

began tearing up. McCashew noticed that he was emotional and said that he could tell that Walker was upset and that he should go home and could stay home the following day if he needed to.

47. On or about March 14, 2012, after leaving Brown's office Walker attempted to call Bradley but her phone went to voicemail. Walker left her a message about a people treatment incident and said that he wanted to speak with her and file a grievance in accordance with the Respondent's Respect for People program that was available.

48. On or about March 15, 2012, Walker spoke with Bradley about the incident with Dunn in the parking lot on or about March 14, 2012. Walker explained what had happened.

49. On or about March 15, 2012, Walker spoke with Brin Taylor ("Taylor"), H/R Manager, on the phone about the incident with Dunn and Walker's use of the word "f–k," which Dunn had also used during the same incident. Walker told Taylor that he had discussed how his coworkers were treating him with Bradley on or about February 9, 2012. Walker told Taylor that he had PTSD and that he had been discussing strategies of how to address situations where he was feeling uncomfortable with how his coworkers were treating him. Taylor said that she had never heard of such behavior from people in a work group before. Taylor told Walker that she would talk with Brown and let her know that Walker could walk out of the office when he was feeling uncomfortable or being bullied. Taylor told Walker not to worry about the situation and that he was not going to lose his job or be put on probation because of it.

50. On or about March 15, 2012, later in the evening Brown called Walker on his cell phone to tell him that he was not to come to work until he heard from her. She told him not to take it the wrong way, remain calm, and that he would not have to use vacation days for this time

10

off. Brown also told Walker that she was going to "get to the bottom of this." She did not tell him that he was suspended.

51. On or about March 16, 2012, Brown, McCashew, Bradley, Jane Sylvester ("Sylvester") from H/R, and Michelle Riley ("Riley") from H/R conducted a confidential meeting regarding a "people treatment incident."

52. On or about March 16, 2012, shortly after the confidential meeting, Bradley left a message on Walker's home phone asking him to call her back. Walker returned Bradley's call and spoke with her. Bradley asked him to come in for an H/R interview on March 19, 2012 at 11:15 a.m.

53. On or about March 18, 2012, Brown texted Walker that H/R would be contacting him for an interview.

54. On or about March 19, 2012, Walker was interviewed by Sylvester and Riley from Respondent's H/R department as part of the investigation into his complaint. They asked Walker if he told Dunn that he was going to blow his own brains out, if he said "if you're on DuPont property you're safe," and if he made a sniper comment. Walker told Sylvester and Riley that the last two comments were made when Walker was talking to his work group about a former coworker who was also forced to resign after being bullied and harassed by the same employees who were now targeting Walker. Walker said that his work group was very worried that the former coworker might retaliate. Walker, in an attempt to reassure them, told them that the coworker could be a sniper in the woods behind the site but as long as they were on DuPont property they were safe. These comments and conversations had been made in approximately 2006, nearly four years before the incident on or about March 14, 2012. Walker told Sylvester

11

and Riley that he did not remember making the comment about blowing his brains out.

55. On or about March 20, 2012, an investigation team met to discuss Walker's complaint.

56. On or about March 21, 2012, a member of the investigation team spoke with Brown about Walker.

57. Walker was never contacted about the outcome of the investigation of his complaint.

58. On or about March 29, 2012, Walker received a call from H/R asking him to go to the Chestnut Run Security office for a meeting. Walker went to the security office and met with McCashew and Taylor. McCashew gave Walker an "elective resignation" letter. McCashew then read off a list of reasons that Walker was being asked to resign from a sheet of paper. McCashew gave the reasons as yelling, profanity, slamming chairs, and insubordination. McCashew then left the room without giving Walker a copy of the reasons for his termination. Walker has yet to receive a written copy of the alleged reasons for his termination.

59. After McCashew left the room, Taylor repeatedly said "I'm sorry" to Walker. Taylor handed him a box of his things and Walker left the building.

60. On or about March 29, 2012, Walker was wrongfully terminated from DuPont.

61. On or about August 1, 2012, Walker received a letter from Respondent informing him that it was cancelling his health care plan retroactive to April 1, 2012.

62. As a result of this discrimination not only has Walker lost his position as a records management specialist but he has also suffered severe emotional pain and suffering. He was bullied and tormented by his coworkers because of his PTSD. The policies and systems put in place by Respondent, including its H/R department and Respect for People program, failed to

12

protect him from discrimination, harassment, and a hostile work environment.

63. Walker has lost his job and health insurance coverage. He is suffering lost wages and benefits, lost future wages and benefits, past and future economic loss, attorney's fees, retirement benefits, and other employment benefits offered by DuPont. He has also needed psychological counseling and medication as a result stress and anxiety related to his treatment by Respondent.

13