IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROBERT E. WALKER, JR.,                )
                                      )
            Plaintiff,                )
                                      )
      v.                              ) Civ. No. 14-1500-SLR
                                      )
E.I. DUPONT DE NEMOURS AND CO., )
                                      )
            Defendant.                )

---

Robert E. Walker, Jr., Newark, Delaware.  Pro se plaintiff.

Kathleen Furey McDonough, Esquire, and Stephanie E. O'Byrne, Esquire, Potter Anderson & Corroon, LLP, Wilmington, Delaware.  Counsel for defendant.

---

**MEMORANDUM OPINION**

Dated: August 11, 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Robert E. Walker, Jr. ("plaintiff") filed this lawsuit alleging employment discrimination pursuant to 29 U.S.C. §§ 621, et seq., and 42 U.S.C. §§ 12101, et seq. He proceeds pro se. Before the court is defendant E.I. du Pont de Nemours and Company's ("defendant") motion for summary judgment and plaintiff's opposition thereto. (D.I. 24, 25, 26, 28, 29) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons discussed, the motion will be granted in part and denied in part.

## II. BACKGROUND

Plaintiff alleges that he was sexually harassed and that defendant discriminated against him by reason of age and disability. (D.I. 1) Plaintiff's employment was terminated on March 29, 2012. (*Id.*) He was 59 at the time. (D.I. 26, ex. A at 32)

Defendant hired plaintiff in December 1989. (*Id.* at 7) Plaintiff was called to active duty during the first Gulf War and served approximately eight months. (*Id.* at 12) Prior to his termination, plaintiff was a records management specialist in defendant's corporate records information management ("CRIM")/microfilm group, having held the position since 2004. (*Id.* at 10-11)

Plaintiff testified that he was diagnosed with post traumatic stress disorder ("PTSD") in 2005. (D.I. 26, ex. A at 19) The diagnosis was the result of events that occurred during his military service during the 1991 Gulf War, coupled with the 2004 suicide of his son. (*Id.* at 20) His symptoms include anger issues, flashbacks and

nightmares, hypervigilance, guilt, and difficulty leaving the house. (D.I. 28, ex.) Plaintiff testified that his PTSD did not affect his ability to perform his job. (D.I. 26, ex. A at 22)

Brown, who supervised plaintiff, has worked in plaintiff's group since 2007. (D.I. 26, ex. A at 11; Ex. B at FRW4) She experienced plaintiff's behavior issues and also heard about them from different members of the group. (D.I. 26, ex. B at FRW4) She described outbursts where plaintiff could not control himself. (*Id.*) Plaintiff told his co-workers about his condition in an effort to educate them, and they knew he attended therapy sessions and counseling. (*Id.* at 55, 69)

Plaintiff testified that he was bullied by three of his co-workers. (*Id.* at 61) None of these individuals were involved in hiring or firing decisions, but had some input. (*Id.* at 66) His co-workers called him names such as "the Unabomber" and "Dietrich"[1] to his face. (*Id.* at 54-56, 78)

Plaintiff testified he was called "the Unabomber" because "they were afraid I would go postal and harm them in some way because they didn't like the expression on my face" and because of his moods. (*Id.* at 57-58) According to the co-worker, plaintiff looked like the Unabomber because of a coat he wore with the hood up during the winter. (*Id.* at 79-80) Plaintiff also testified that his co-workers told him that he was "being miserable looking." (*Id.* at 57, 79) Plaintiff testified that certain co-workers made comments about being in the military (even though they were not) or wanting to join the military (even though they had not). (*Id.* at 81) Plaintiff found these commends offensive and likened them to stolen valor. (*Id.*)

---

[1] A know-it-all character on television.

2

Plaintiff also testified that he was sexually harassed by one co-worker who texted him several pornographic images over a two-year time-frame. Plaintiff asked the co-worker to stop sending the images on three occasions and, after the third request, told him that he was going to HR. (Id. at 96-97) Although plaintiff never informed Brown about the pornographic pictures, the texting stopped with the threat of going to HR in February or March 2012. (Id. at 18, 94-95, 97 98)

Because of his PTSD, plaintiff asked Brown to move him from the pod containing four work stations that he shared with three co-workers. (Id. at 70-72, 75) Plaintiff testified he told Brown that he was making the request based upon his PTSD and to be away from the environment in the pod that was affecting him, but he also testified that he could not be specific as to what he actually said. (Id. at 76) Plaintiff mentioned the attitude of the people, comments (including references to suicide) that were being made, the negativity, and that, with the move, he could work better. (Id. at 76-77) Plaintiff did not mention the name-calling because it had not taken place at that point. (Id.) Plaintiff asked to be moved to a separate designated work area, an area he had been allowed to work in during a specific work assignment. (Id. at 72-74) The requested move was from inside the pod to an outside pod, but it was denied as too expensive because of turning on an internet port and a telephone line. (Id. at 75)

According to plaintiff, every month prior to his termination, Brown asked him when he was going to retire. (Id. at 32) She asked approximately six times. (Id. at 33) Plaintiff told Brown that, when he reached 62, he would take a look at it and, based upon the economy, make a decision whether to stay or continue his career. (Id.)

3

Plaintiff testified that defendant treated younger people more favorably. (*Id.* at 36, 38-39)

The week of February 12, 2012, Brown and plaintiff discussed his performance rating for 2011. (D.I. 26, ex. B at FRW4)  Thereafter, plaintiff spoke to Mary Ann Bradley ("Bradley") in HR about everything that was going on, including the incidents and comments. (D.I. 26, ex. A at 99)  Plaintiff did not recall telling Bradley that he thought he was being targeted because of his PTSD, but has testified that defendant's decision to terminate his employment was based upon his PTSD condition. (*Id.* at 39, 100)  He testified that following his dismissal, defendant held meetings regarding the treatment of people with disabilities. (*Id.* at 42-44)  Plaintiff believes the meetings were directly related to his dismissal, but he did not talk to anyone about what transpired during the meetings. (*Id.* at 44-45)

Defendant conducted an investigation into plaintiff's involvement in two incidents in March 2012. (D.I. 26, ex. B)  Its investigation found that, on March 9, 2012, plaintiff made a comment about a co-worker's Eagle's jersey; she responded, and called plaintiff a "grouch." (D.I. 26, ex. B at FRW1)  In turn, plaintiff yelled that he was "tired of working with you fucking children." (*Id.*)  He then left the building for approximately 30 minutes. (*Id.*)  Plaintiff received a verbal warning as a result of this incident. (*Id.* at FRW4)

The investigation found that on March 14, 2012, Brown and plaintiff had a "great" discussion and set goals for plaintiff, focusing on his strengths and things he needed to work on. (*Id.*)  Brown stated it was a very positive interaction. (*Id.*)  At the end of the day, however, plaintiff had a verbal altercation in the site parking lot with a co-worker. (*Id.* at FRW2)  According to the co-worker's version of the facts, plaintiff called him a

"fucking backstabber" multiple times and asked "do you want me to blow my head off?," then plaintiff followed him back into the office building where he reported the incident to Brown. (*Id.* at FRW4-5)  During the subsequent meeting, Brown told plaintiff that he could not yell and curse in the office. (*Id.*)  Plaintiff responded, "there is nothing I can do about it," and Brown responded, "yes there is." (*Id.* at 2)  Brown told plaintiff to go home and she would contact HR. (*Id.*)  Plaintiff said he missed his son and left the office crying. (*Id.*)  Brown feels plaintiff used his son as an excuse for his anger/behavior with others in the office. (*Id.* at FRW5)

Plaintiff was interviewed during the investigation and admitted saying "fuck" only once on March 14, 2012. (*Id.* at FRW3)  HR also interviewed witnesses to both incidents and substantiated the complaints that plaintiff yelled and cursed at co-workers. (*Id.* at 3-5)  The investigation found that plaintiff's co-workers were fearful for their personal safety when plaintiff was in a dark or bad mood. (*Id.*)  Some team members admitted that plaintiff could be a pleasure to work with on some days, but most days they walked on eggshells. (*Id.* at FRW3)

Plaintiff never saw the investigation report and was not given an opportunity to rebut the report. (D.I. 26, ex. A at 100-101)  During the investigation, plaintiff was told to stay away, not to worry about anything, and that he would not be fired or terminated. (*Id.*))  Meetings with plaintiff's supervisors and co-workers were scheduled on March 16, 2012 and May 11, 2012.[2] (D.I. 26, ex. D)

---

[2]The record does not indicate what was discussed at these meetings.  The March meeting notice is titled "confidential discussion" and the May meeting notice is titled "team follow-up session with Human Resources." (*Id.*)

Plaintiff's understanding is that he was terminated based upon comments people made during the investigation, partially because of Brown, and something to do with defendant's belief that he directed profanities at co-workers. (*Id.* at 100, 102-03) During his deposition, when asked about the parking lot incident, plaintiff did not deny using profane language in the hallway coming back from the parking lot. (*Id.* at 103) With regard to the Eagle's jersey incident, plaintiff recalled that it was his co-worker, not him, who went on a rant. (*Id.*)

On March 29, 2012, plaintiff received a separation letter that his employment was terminated effective that day. (D.I. 26, ex. C) Plaintiff, who was 59, had worked twenty years with defendant and, as a result, certain retirement benefits would have kicked in at age 60 had he remained employed. (D.I. 26, ex. A at 106) Plaintiff filed a charge of discrimination in November 2012, and received a notice of suit rights dated September 22, 2014. (D.I. 1, exs.) He commenced this action on December 22, 2014.

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other

6

materials," or by "showing that the materials cited do not establish the absence or
presence of a genuine dispute, or that an adverse party cannot produce admissible
evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has
carried its burden, the nonmovant must then "come forward with specific facts showing
that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation
marks omitted). The court will "draw all reasonable inferences in favor of the
nonmoving party, and it may not make credibility determinations or weigh the evidence."
*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more
than simply show that there is some metaphysical doubt as to the material facts."
*Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. United States Postal Service*, 409
F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present
more than just bare assertions, conclusory allegations or suspicions to show the
existence of a genuine issue") (internal quotation marks omitted). Although the "mere
existence of some alleged factual dispute between the parties will not defeat an
otherwise properly supported motion for summary judgment," a factual dispute is
genuine where "the evidence is such that a reasonable jury could return a verdict for the
nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the
evidence is merely colorable, or is not significantly probative, summary judgment may
be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*,
477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a
party who fails to make a showing sufficient to establish the existence of an element

7

essential to that party's case, and on which that party will bear the burden of proof at trial").

With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Blozis v. Mellon Trust of Delaware Nat'l Ass'n*, 494 F. Supp. 2d 258, 267 (D. Del. 2007) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987)).

Defendant moves for summary judgment on the grounds that: (1) there are no material issues of fact and judgment as a matter of law is appropriate; (2) it did not subject plaintiff to a hostile work environment; (3) plaintiff cannot show that his termination was the result of unlawful discrimination; (4) plaintiff cannot show that his termination was the result of unlawful retaliation; and (5) plaintiff cannot establish a failure to accommodate claim.

## IV. DISCUSSION

### A. Disability, Gender, and Military Service-Based Hostile Work Environment

Plaintiff alleges disability, gender, and military service-based hostile work environment under the Americans with Disability Act ("ADA"), 42 U.S.C. § 1201, et seq., Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq., and the Uniformed Services Employment and Reemployment Rights Act

8

("USERRA"), 38 U.S.C. § 4303(2).[3]  A plaintiff must establish four elements to succeed on a hostile work environment claim:  (1) the employee suffered intentional discrimination because of his protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; [and] (4) the discrimination would detrimentally affect a reasonable person of the same protected class in that position.  *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (plaintiff may establish that employer violated Title VII by proving that sexual harassment created a hostile work environment); *Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 667 (3d Cir. 1999) (successful ADA hostile environment claim requires that the harassment was based on the disability or a request for an accommodation); *Church v. City of Reno*, 610 F. App'x 636 (9th Cir. 2015) (unpublished) (circuits have recognized that hostile work environment claims could be brought under USERRA).  In addition, for employer liability, a plaintiff must also establish a fifth element - respondeat superior.  *See Huston*, 568 F.3d at 104.  When the harasser is a co-worker, employer liability attaches "only if the employer failed to provide a reasonable avenue for complaint, or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998).

The standard is an objective one based on "an environment that a reasonable person would find hostile or abusive."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21

---

[3]Plaintiff, who proceeds pro se, did not invoke the USERRA in his complaint. However, liberally construing his complaint and in reviewing his deposition testimony, it appears that plaintiff raises a claim under the statute.

(1993). To determine if the alleged harassment is so hostile or abusive that it rises to the level of an unlawful hostile environment, the Supreme Court directs that courts "look[ ] at all the circumstances," including the frequency of the alleged conduct. *Id.* at 23; *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990) (quoting *Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1510 (11th Cir. 1989)) (stating that "a plaintiff must establish by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee"). The "sufficiently demanding" "standards for judging hostility" "ensure that [the relevant statute] does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998)).

The evidence of record is that the offending comments were made by plaintiff's co-workers. Therefore, the court analyzes the hostile work environment claims under the respondeat superior theory to determine if defendant failed to provide a reasonable avenue for complaint or, in the alternative, if defendant knew or should have known of the harassment and failed to take prompt and appropriate remedial action.

With regard to disability harassment, the record shows that the Dietrich comments refer to a "know it all" character, not PTSD or any protected class and, while the Unabomber could possibly be construed as related to plaintiff's PTSD, plaintiff testified they were made each time he wore a hooded jacket as shown in a widely disseminated composite sketch of the Unabomber prior to the time he was identified.[4]

---

[4]*See* http://www.npr.org/2011/05/24/136616438/unabombers-criminal-collectibles-up-for-auction (Aug. 3, 2016) (showing composite sketch).

Given plaintiff's testimony, it cannot be said that the Unabomber comments were related to his PTSD but, rather, to his style of dress.[5]  The two military comments plaintiff found offensive were made by two co-workers who never served in the military.  It cannot be said that two comments amount to conduct that is severe and pervasive.  Finally, the sexual harassment took place over a two-year period; when plaintiff threatened to report the conduct, it stopped.

In his opposition to the motion, plaintiff argues that "profanity, vulgarity, and inappropriate behavior was commonplace in [his] group . . . vulgar jokes, pornographic pictures shared, name calling . . . Brown even used the "F" word on occasion."  (D.I. 28 at 3)  The court finds the comments complained of by plaintiff are not related to a protected class even though they could be considered offensive and inappropriate.  *See Henson v. U.S. Foodservice, Inc.*, 588 F. App'x 121, 127 (3d Cir. 2014) (unpublished) (co-worker's racial jokes and comments during lunch breaks "were insufficient to create a hostile work environment," where the plaintiff failed to show the comments "were so severe and pervasive that a reasonable person in his position would believe that the conditions of his employment were altered").

Plaintiff has also failed to produce evidence from which a reasonable jury could find a basis for respondeat superior liability.  Plaintiff testified that he spoke to HR about the comments, but he does not recall telling HR that he was being targeted because of his PTSD.  Nor is there any evidence that he advised HR that the alleged harassment

---

[5]Plaintiff learned that he was called "Timothy McVeigh."  However, the court does not consider the comments because they were not made directly to Plaintiff, and he did not learn about them until after-the-fact when he reviewed some documents.  (D.I. 26, ex. A at 107)

was due to his military service or that he told HR about the inappropriate texting until after the conduct stopped.  Instead, plaintiff's testimony indicates that defendant provided him a reasonable avenue for his complaints and that plaintiff availed himself of this avenue by periodically complaining to HR about the conduct of his co-workers.  Nor does the evidence of record support a finding that defendant knew or should have known of the harassment now complained of by plaintiff.

For the above reasons, the court will grant defendant's motion for summary judgment on the hostile work environment claim.

## B. Age and Disability Discrimination, Failure to Accommodate and Termination

Plaintiff alleges that he was unlawfully terminated based upon age and disability. A plaintiff may prove disability discrimination by direct evidence as set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-46 (1989), or indirectly through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The claims raised under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et. seq., and the ADA rely on circumstantial evidence and are controlled by the burden-shifting analysis set forth in *McDonnell Douglas.  See Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 & n.3 (3d Cir. 2004) (applying the *McDonnell Douglas* framework to ADA claims); *Sherrod v. Philadelphia Gas Works*, 57 F. App'x 68, 73 (3d Cir. 2003) (unpublished) (claims of disparate treatment under ADEA must be analyzed under the test articulated in *McDonnell Douglas*).

Under this framework, plaintiff must first establish a prima facie case of discrimination by demonstrating: (1) he is a member of a protected class (i.e., at least

12

40 years of age or disabled within the meaning of the ADA); (2) he is otherwise qualified for the position; (3) he was subjected to an adverse employment action because of age or disability despite being qualified; (4) under circumstances that raise an inference of unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 (3d Cir. 2006). The elements of a prima facie case may vary depending on the facts and context of the particular situation. *See Pivirotto v. Innovative Sys. Inc.*, 191 F.3d 344, 352 (3d Cir. 1999).

If plaintiff succeeds in establishing a prima facie case, the burden shifts to defendant to proffer "legitimate non-discriminatory" reasons for its actions. *See Reeves*, 530 U.S. at 142. If defendant meets this burden, the burden again shifts to plaintiff to demonstrate, by a preponderance of the evidence, that the employer's rationale is pretextual. *Id.* at 142-43. To do this, plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Harding v. Careerbuilder, LLC*, 168 F. App'x 535, 537 (3d Cir. 2006) (unpublished) (quoting *Fuentes*, 32 F.3d at 764 (internal citations and other citations omitted)).

13

Defendant contends that plaintiff is unable to establish a prima facie case of age or disability discrimination and, therefore, summary judgment is appropriate. In the alternative, defendant argues that even were plaintiff to establish a prima facie case of discrimination, he cannot establish that defendant's reasons for terminating his employment were a pretext for discrimination.

### 1. Age

The evidence of record does not support a finding that plaintiff was subjected to an adverse employment action due to his age. Plaintiff testified that a younger co-worker was given an assignment that plaintiff would have liked to have had. However, because the younger co-worker was over 40, he was in the same protected class as plaintiff and the assignment occurred some two years prior to the time of plaintiff's termination. Further, without more, Brown's questioning of plaintiff's intent towards retirement is insufficient to establish a prima facie case of age discrimination.[6] Finally, there is no evidence of record that plaintiff was replaced by another employee who was sufficiently younger to support an inference of discriminatory animus.

### 2. Disability

Plaintiff's disability claim incorporates two adverse employment actions: (1) the failure by defendant to accommodate his disability; and (2) plaintiff's termination due to his disability.

---

[6]An employer's inquiries about retirement are "not direct evidence of age discrimination" as they "could just as easily be explained by a desire on [the employer's] part to do some long-term planning." *Glanzman v. Metropolitan Mgmt. Corp.*, 391 F.3d 506, 513 (3d Cir. 2004).

14

### a. Accommodation

The record reflects that plaintiff was diagnosed with PTSD, that Brown (his supervisor) was aware of the diagnosis, and that plaintiff received treatment for the condition.  The record also reflects that plaintiff asked Brown to move him from his shared pod, and he made the request based upon his PTSD because the environment in the pod was affecting him adversely.  He told Brown that the move would allow him to work better.  The request was denied due to cost considerations.

The definition of discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  The term "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  It is well-settled that "refusing to make reasonable accommodations for a plaintiff's disabilities" constitutes discrimination under the ADA.  *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d at 761.  Under the ADA, if the employer refuses to make an accommodation, the employer must "demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]."  *Id.*

Defendant argues that the failure to accommodate claim fails because there is no evidence that plaintiff informed it he wished to be moved because of his PTSD, he provided no explanation why the move would accommodate his PTSD, and plaintiff was able to fully perform the functions of his job despite the PTSD.  In addition, it contends

15

that, because plaintiff did not address the issue in his opposition to the motion for summary judgment, he has abandoned the claim.

The court has thoroughly reviewed plaintiff's opposition to the motion for summary judgment, and he makes no mention of the failure to accommodate claim. Therefore, the court considers the claim abandoned. "It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal." *Fischer v. G4S Secure Solutions USA, Inc.*, 614 F. App'x 87 n.3 (3d Cir. 2015) (unpublished) (quoting *Liberles v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983). *See also Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal." (internal quotation marks omitted)); *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1077 (2d Cir. 1993) ("[A] party opposing summary disposition of a case must raise all arguments against such remedy in the trial court and may not raise them for the first time on appeal."); *cf. Shell Petroleum, Inc. v. United States*, 182 F.3d 212, 218 (3d Cir. 1999) (stating that, in order for an issue to be preserved for appeal, a litigant "must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits").

Plaintiff has abandoned the failure to accommodate claim and, therefore, the court will grant defendant's motion for summary judgment on this issue.

16

### b. Termination

Defendant contends that plaintiff failed to establish a causal connection between the termination of his employment and his disability.  Defendant argues that the comments were all made by plaintiff's co-workers and the fact that they were afraid of him does not lead to the conclusion they were afraid of him because of his alleged disability or that his employment was terminated because of his disability.

Viewing the facts in the light most favorable to the non-moving party, as the court must, it finds that plaintiff has established a prima facie case of disability discrimination. As to the first element, defendant was aware that plaintiff suffered from PTSD, he had received treatment for some time for the condition, and it was aware that plaintiff had uncontrollable outbursts related to the diagnosed PTSD. As to the second element, plaintiff was able to perform his job.  As to the third and fourth elements, plaintiff was terminated following two incidents when he lost control and under circumstances that raise an inference of unlawful discrimination as defendant was aware of plaintiff's disability.

Defendant alternatively argues that, even had plaintiff established a prima facie case of disability discrimination, he did not produce evidence from which a reasonable juror could find that its reasons for its employment decisions were pretexts for discrimination.  Defendant further contends that it articulated legitimate, nondiscriminatory reasons for its actions.

The court was provided with defendant's "people treatment investigation" report for plaintiff.  The report contains a background, a summary of the March incidents, and findings.  There is no conclusion to the report, and it does not discuss the termination of

17

plaintiff's employment or the reason for the termination of plaintiff's employment, although it discusses plaintiff's past behavioral history. In addition, the March 29, 2012 separation letter does not discuss the reason for the termination of plaintiff's employment. Plaintiff testified that he believed he was terminated for complaining to Bradley about the conditions in his office and, also, that his understanding from defendant is that he was terminated for directing profanities at co-workers. Defendant provided only argument for its reasons for plaintiff's dismissal. The court should not be required, nor is it obligated, to make a guess as to the actual reasons for plaintiff's termination. There remain genuine issues of material fact and, therefore, the court will deny defendant's motion for summary judgment on the issue of whether plaintiff's employment was unlawfully terminated by reason of a disability.

## C. Retaliation

Finally, defendant argues that plaintiff cannot show that his termination was a result of unlawful retaliation because plaintiff did not engage in any protected activity. To establish a prima facie claim of unlawful retaliation, plaintiff is required to show that: (1) he engaged in a protected activity; (2) defendant took an adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action taken.[7] *See Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006). The plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*

---

[7]*See Sherrod v. Philadelphia Gas Works* , 57 F. App'x at 73 (describing an adverse employment action).

18

& *Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). The court examines the challenged conduct "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. at 81).

With respect to the causation prong, the court considers whether a reasonable jury could link the employer's conduct to retaliatory animus. *See Jensen v. Potter*, 435 F.3d 444, 449 n.2 (3d Cir. 2006) (explaining that "[t]he ultimate question in any retaliation case is an intent to retaliate vel non"). In assessing this, the court considers the "temporal proximity" between the plaintiff's protected activity and the employer's allegedly retaliatory response, and "the existence of a pattern of antagonism in the intervening period." *Id.* at 450 (quotations and citations omitted). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist.*, 532 U.S. at 273-74 (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four month period insufficient).

Defendant argues that plaintiff did not engage in protected conduct. To the contrary, plaintiff testified that he spoke to HR about what was going on and that he had "gone and made a complaint" following the parking lot incident and during defendant's

19

investigation, but prior to the time he was terminated.[8]  In addition, plaintiff testified that he reported the pornographic texts in February or March of 2012, a month or so prior to his termination.

Defendant further argues that even had plaintiff engaged in protected activity, there is no evidence of a causal connection between his conversations and the decision to terminate his employment.  However, the temporal proximity between plaintiff's complaints to HR and his termination is sufficient evidence of causality to establish a prima facie case.

The court concludes that plaintiff has established a prima facie case of retaliation.  As discussed above, there remain genuine issues of material fact as to defendant's reasons for terminating plaintiff's employment.  Therefore, the court will deny defendant's motion for summary judgment on the issue of whether plaintiff's termination of employment was the result of unlawful retaliation.

## V. CONCLUSION

For the reasons discussed, the court will grant in part and deny in part defendant's motion for summary judgment.  (D.I. 24)  An appropriate order will be entered.

---

[8]Plaintiff testified that he complained to Bradley about the atmosphere in his work area, but he did not recall telling her that he was being targeted because of PTSD.

20